**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JORGE LUIS ESQUIVEL-ORTEGA,
*Defendant-Appellant.*

No. 05-30355

D.C. No.
CR 02-0374 JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Chief District Judge, Presiding

Argued and Submitted
March 6, 2007—Seattle, Washington

Filed May 8, 2007

Before: Diarmuid F. O'Scannlain, A. Wallace Tashima, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Tashima

**COUNSEL**

William C. Broberg, Seattle, Washington, for the defendant-appellant.

Jill Otake, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

**OPINION**

TASHIMA, Circuit Judge:

Jorge Luis Esquivel-Ortega ("Esquivel") challenges the

sufficiency of the evidence to support his convictions for conspiracy to distribute cocaine and heroin, and possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846. We conclude that the evidence is insufficient to sustain the convictions and therefore reverse.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291.

## BACKGROUND

From late 2001 to the end of 2002, agents of the federal Drug Enforcement Agency ("DEA") based in Seattle, Washington, were investigating a drug conspiracy. Pursuant to this investigation, agents intercepted calls on a telephone belonging to Pedro Sanchez. DEA agents learned from these calls that a white minivan containing drugs would be traveling from southern California to Sanchez's home in Auburn, Washington, on September 29, 2002. DEA agents asked officers from the Renton, Washington, police department for their help in apprehending the vehicle.

Around 6:00 p.m. on September 29, 2002, DEA agents listening to telephone calls on Sanchez's phone heard a conversation between Sanchez and a "Hispanic male in the vehicle," giving the vehicle directions to Sanchez's residence. DEA agent Scott Smith saw a vehicle that fit the description travel-

---

[1]Because we reverse Esquivel's convictions on the basis of the insufficiency of the evidence, we do not reach his arguments that the district court erred in giving a deliberate ignorance instruction to the jury, and that the government engaged in misconduct by making improper comments in its opening and closing arguments. We also decline to consider Esquivel's claim of ineffective assistance of counsel. *See United States v. Daychild*, 357 F.3d 1082, 1095 (9th Cir. 2004) ("[W]e do not ordinarily consider on direct review claims challenging the efficacy of a criminal defendant's representation."). The record on appeal is not "sufficiently developed to permit determination of the issue." *United States v. Jeronimo*, 398 F.3d 1149, 1156 (9th Cir.), *cert. denied*, 126 S. Ct. 198 (2005). Nor does the trial record reveal that "the legal representation [was] so inadequate that it obviously denie[d] [Esquivel] his Sixth Amendment right to counsel." *Id.*

ing the expected route and followed the van in an unmarked vehicle. DEA agent Ernest Roberson continued the surveillance when the van exited the highway, following the vehicle to a gas station, where the driver was seen using a cell phone.

After the van left the gas station, Renton police officers Christopher Edwards and Brett Shavers stopped the van at the instruction of the DEA agents, explaining to the van's occupants that the van was going 40 miles per hour in a 30 mile per hour zone, but not mentioning the drug investigation, in order not to compromise the investigation. Iram Sanchez-Sandoval was the driver, and Esquivel, Esquivel's wife, and their ten-year-old daughter were the passengers.

Shavers spoke with the driver and with Esquivel. Esquivel told him that a relative owned the van, that "he was in the van," and that they were sharing driving. Esquivel told Shavers that he was on vacation and that they were going to visit someone named Pedro, although he did not really know Pedro.

All three adults gave Shavers verbal consent to search the van, and Shavers asked Esquivel for written consent for the search. Officers with a K-9 unit arrived about an hour later. The dog "showed some interest" in a bag containing clothing, but no drugs were found in the bag. Officers found a spatula, or putty knife, and a small crowbar in the back of the van, "behind the rear seat, between the rear seat and the hatch for the door." Smith testified that the spatula contained Bondo, which he described as "a plastic adhesive used for auto body work."

Shavers, who was the officer speaking to the van's occupants, testified that the van's occupants were calm when he arrived and that he watched for any changes in their reactions, but he did not notice any reactions during or after the search. According to Shavers, after the search — when a tow truck arrived, and Shavers told Esquivel that the van was going to

be impounded — Esquivel became upset and started crying. Shavers testified that, when asked why he was crying, Esquivel said that he needed to leave the area, that this was the first time he had been in trouble, and that he was worried about his family and wanted to take care of his family.

At some point during the stop, Smith learned that the wire room, which was where the phone calls were monitored, was going to place a call to the cell phone that had been wiretapped in order to confirm that they had stopped the correct vehicle. Esquivel's wife had possession of the phone, and it did ring at the time Smith was told it would. She did not answer the phone.

The stop lasted about an hour and a half to two hours. Officers then called a taxi for Esquivel and his family.[2]

The following day, DEA agents obtained a warrant to search the van. They sawed off the bumper and discovered a panel, approximately ten inches wide and two inches tall, "in the back which had been covered with Bondo and painted so it looked like it was part of the factory surrounding molding." After removing the bumper, the agents found 15 kilograms of cocaine in this hidden compartment.

On December 12, 2002, the government filed a First Superseding Indictment charging numerous defendants with 28 counts relating to the conspiracy. Esquivel was charged in two of the counts: Count 1, conspiracy to distribute cocaine, heroin, and methamphetamine, and Count 14, possession of cocaine with intent to distribute. Esquivel was not arrested until May 7, 2004, at his home in Moreno Valley, California.

The case was tried to a jury. At the close of the govern-

---

[2]Sanchez-Sandoval, however, was detained pursuant to the request of immigration authorities, because investigators had learned that he was in the United States illegally.

ment's case, Esquivel moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, arguing that there was no evidence of Esquivel's knowledge of the drugs and that the government was relying for evidence on Esquivel's emotional state during a traumatic traffic stop. The government argued that Esquivel gave no explanation for the trip, that he had no luggage and had driven through the night to Auburn, and that he "fell apart" when the police seized the van. The district court denied the motion. Esquivel was found guilty of both counts with which he was charged and was sentenced to 100 months' imprisonment.

## STANDARD OF REVIEW

The sufficiency of the evidence to support a conviction is reviewed de novo. *United States v. Ruiz*, 462 F.3d 1082, 1087-88 (9th Cir. 2006). Viewing the evidence in the light most favorable to the government, we must determine whether any rational jury could have found Esquivel guilty of each element of the crime beyond a reasonable doubt. *Id.* at 1088.

The government contends that review is deferential because, although Esquivel moved for a judgment of acquittal after the government rested, he subsequently introduced further evidence and then failed to renew his motion. Thus, according to the government, we should reverse " 'only to prevent a manifest miscarriage of justice, or for plain error.' " *United States v. Barragan*, 263 F.3d 919, 922 (9th Cir. 2001) (quoting *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1200-01 (9th Cir. 2000)); *see also United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004) (stating that, "when a defendant does not preserve a claim of sufficiency of the evidence by failing to make a motion for acquittal at the close of the evidence, the review is deferential, requiring reversal only upon plain error or to prevent a manifest injustice"); *United States v. Veerapol*, 312 F.3d 1128, 1131 (9th Cir. 2002) (reviewing for plain error a challenge to the sufficiency of the

evidence where the defendant "failed to raise this claim at any point before the district court"); *United States v. Hernandez-Guardado*, 228 F.3d 1017, 1022 (9th Cir. 2000) ("Because neither appellant in this case made or renewed an earlier motion for an acquittal at the close of all evidence, we review only for plain error and to prevent a miscarriage of justice.").

We reject the government's argument. In *Barragan*, *Delgado*, *Veerapol*, and *Hernandez-Guardado*, the defendants never moved for a judgment of acquittal. Here, by contrast, Esquivel did move for acquittal under Rule 29, and defense counsel argued the motion extensively. After the court denied the motion, defense counsel rested, "subject to the offering which the government is in possession of the actual audio tape of call number 311, the transcript of which we have as exhibit number 19. And the government is also in possession of the exemplar from Mr. Esquivel and that would also be offered." The court replied that both the audio tape and the voice exemplar would be admitted, and both were played for the jury. The court then dismissed the jury briefly in order for the parties to discuss jury instructions. The court then brought the jury back in and gave the instructions.

**[1]** The evidence offered by defense counsel following the motion for acquittal was the audio tape of a call whose transcript already had been admitted into evidence and the voice exemplar in the government's possession. Given the nature of the evidence, and the fact that the court had denied Esquivel's motion for acquittal only a few moments earlier, requiring Esquivel to renew his motion at that point would have been " 'an empty ritual.' " *United States v. Pennington*, 20 F.3d 593, 597 n.2 (5th Cir. 1994) (quoting *United States v. Gonzalez*, 700 F.2d 196, 204 n.6 (5th Cir. 1983)); *see also Alvarez-Valenzuela*, 231 F.3d at 1201 (discussing the holding in *Pennington*, but declining to reach the defendant's argument that "if the record suggests that at the time the original motion was denied it would be futile to raise it again, it need not be renewed"). Here, the record shows that it would have been

futile for Esquivel to renew his motion following the offering of those two pieces of evidence. Our review accordingly is de novo.[3]

## DISCUSSION

Esquivel contends that the evidence is insufficient to support his convictions because there is no evidence to establish his knowledge or possession of the cocaine or his knowledge of or involvement in the conspiracy. In order to sustain Esquivel's conspiracy conviction, the government must prove "(1) an agreement to accomplish an illegal objective, and (2) the intent to commit the underlying offense." *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001). The government further must prove beyond a reasonable doubt that Esquivel "(1) knowingly, (2) possessed an illegal drug, (3) with the intent to distribute it." *Delgado*, 357 F.3d at 1065.

Viewing the evidence in the light most favorable to the government, we conclude that Esquivel's convictions cannot be sustained. The government argues vigorously that Esquivel "must have known" about the cocaine and relies on what it calls "reasonable inferences" to attempt to tie Esquivel to the cocaine and the conspiracy. What the government fails to do, however, is to point to any evidence indicating Esquivel's knowledge of either the cocaine or the conspiracy, or his knowing possession of the cocaine.

## I.  Possession Conviction

**[2]** "[I]t is 'well established that a passenger may not be

---

[3]*Alvarez-Valenzuela* did not need to decide whether to follow *Pennington* because the defendant in *Alvarez-Valenzuela* did not move for acquittal on the basis of the insufficiency of the evidence at the close of the government's case. Rather, defense counsel made "only a perfunctory 'motion to dismiss generally.' " *Alvarez-Valenzuela*, 231 F.3d at 1201. Here, defense counsel argued the motion extensively.

convicted unless there is evidence connecting him with the contraband, other than his presence in the vehicle.' " *United States v. Sanchez-Mata*, 925 F.2d 1166, 1169 (9th Cir. 1991) (quoting *United States v. Ramos*, 476 F.2d 624, 625 (9th Cir. 1973)). The defendant in *Sanchez-Mata* was a passenger in a vehicle that smelled so strongly of marijuana, which was in the trunk, that officers could smell it outside the vehicle. He looked nervous throughout the roadside stop, but he did not resist arrest, carry a weapon, or possess any drugs. "He was never seen touching the marijuana and his fingerprints were not on the bags. He did not have a key to the Audi. He was never observed with co-defendants at any other time." *Id.* at 1167. We concluded that the government had failed to produce sufficient evidence that he "had even a slight connection with the conspiracy," and therefore reversed his conviction for conspiracy with intent to distribute. *Id.* at 1168. We also reversed the conviction for possession with intent to distribute because the only evidence of possession was his presence as a passenger in the car, which we held was insufficient to sustain the conviction. *Id.* at 1169.

It is true that "[a] jury can infer knowledge when an individual is the driver and sole occupant of the vehicle." *United States v. Diaz-Cardenas*, 351 F.3d 404, 407 (9th Cir. 2003). That, however, is not the case here. In *Diaz-Cardenas*, the defendant drove a vehicle carrying drugs worth over $1 million into the United States from Mexico. Not only was he the driver and sole occupant, but he also was the registered owner of the vehicle. He asserted lack of knowledge of the drugs, but we rejected his challenge to the sufficiency of the evidence, stating that the jury could infer knowledge from the fact that he was the driver and sole occupant of the vehicle and from the possession of a large quantity of drugs. *Id.*

**[3]** Unlike *Diaz-Cardenas*, Esquivel was only a passenger in the van. He was not the driver, sole occupant, or registered owner of the vehicle. Essentially, the government's argument is that Esquivel must have known about the drugs because of

his presence in the van and because he allegedly "supplied his relative's minivan" for the trip. Esquivel's mere presence in a vehicle in which drugs were later found clearly is insufficient to establish his knowledge of the drugs. *See Sanchez-Mata*, 925 F.2d at 1169; *see also United States v. Lopez*, 477 F.3d 1110, 1113 (9th Cir. 2007) ("Mere proximity to drugs does not establish knowing possession."). Although the government argues that Esquivel supplied the van for the trip, it has not presented any evidence of his control over the van other than Shavers' testimony, which was as follows: "From what I recall is the passenger [Esquivel] claimed that his — I think a relative was the owner of the van and that he was in the van. They were sharing driving." This does not establish Esquivel's ownership or control of the van.

[4] The government also relies on the alleged non-stop nature of the trip to argue that Esquivel must have known about the drugs. To support this argument, the government points out that the van was littered with fast food containers and that there was no luggage in the van, which would call into question Esquivel's assertion that he was taking a vacation. The government's arguments are unavailing. First, the only evidence regarding fast food containers is a photograph (Exhibit 2), but the photograph shows only that there is trash on the floor of the van, which does not seem that unusual for an extended trip.

[5] Moreover, the government's assertion that Esquivel did not have any luggage was based on the testimony of Smith that the van contained only one "big red luggage bag," which he thought contained "predominantly children's clothing." He could not recall whether the bag contained adult clothing. Shavers also searched the bag, and he testified that he could not recall whether the bag contained clothing. In short, the government's assertion that a purported lack of clothing belies Esquivel's claim that this was a vacation simply is not supported by the evidence.

**[6]** Finally, the government argues that Esquivel must have known about the cocaine because he failed to give an explanation for the trip. He told Shavers that he was taking a vacation. The burden, however, is not on Esquivel to prove the innocent nature of his journey. "When there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one." *United States v. Vasquez-Chan*, 978 F.2d 546, 549 (9th Cir. 1992); *see also Delgado*, 357 F.3d at 1068 (recognizing the same point). The only evidence cited by the government to support its assertion that Esquivel's explanation is contradicted by the evidence is one page of testimony. This part of the transcript, however, does not contradict Esquivel's claim in any way; it is merely the testimony of Shavers that Esquivel told him that he was taking a vacation.

In *Vasquez-Chan*, the two appellants lived in a two-bedroom house where DEA agents discovered a large quantity of cocaine. Most of the cocaine was stored in the bedroom occupied by one of the appellants, and her fingerprints were found on some of the containers. The appellant's "innocent explanation" for her fingerprints was that she needed to move the containers in order to make room in the small bedroom for her and her child. *Vasquez-Chan*, 978 F.2d at 551. The evidence against her was that she knew about the cocaine, even sleeping in the bedroom where the containers were kept, and her fingerprints were found not only on, but inside the cover of a container. Nonetheless, she had never been identified during the course of the investigation, she did not lease or rent the house, and she did not attempt to destroy or conceal evidence or flee from the police. We concluded that the evidence was not sufficient to establish guilt beyond a reasonable doubt because the evidence "did not establish any reason to believe that an innocent explanation of that evidence was any less

likely than the incriminating explanation advanced by the government." *Id.*

**[7]** The government's reliance on Esquivel's emotional state during the stop does not make the government's incriminating explanation any more likely than Esquivel's innocent explanation. His reaction during the stop is entirely consistent with an innocent explanation. It is understandable that he would become upset after a stop, ostensibly for speeding, that lasted almost two hours, after dark, and that resulted in the police impounding the vehicle, leaving his family stranded in a distant location with no means of transportation.

None of the evidence cited by the government establishes Esquivel's knowledge of the cocaine. His mere presence in the vehicle in which cocaine was later found is not sufficient. There is no evidence that he "supplied" the minivan for the trip. The nonstop nature of the trip is not established by the evidence, and, at any rate, it does not support a finding that Esquivel knew about the cocaine. The government does not dispute the fact that even a canine search of the van during the initial stop did not uncover the cocaine. The government concedes that there was no smell of drugs in the van. There is no evidence that Esquivel's fingerprints were found on the Bondo knife or on the drugs. During the almost two years between the stop and his arrest, Esquivel never attempted to hide or flee from authorities.

Not only does the evidence fail to establish Esquivel's knowledge of the cocaine, it also does not establish that he had possession. In order to be convicted of possession, Esquivel "must have had the power to exercise dominion and control over the narcotics." *Id.* at 550.

The cocaine was secreted behind the bumper in a compartment that officers were able to reach only after sawing open the bumper. A search by a canine unit during the initial stop did not uncover the cocaine. There is no evidence that Esqui-

vel knew about the Bondo knife or had ever touched it, and his fingerprints were not found on the knife or the drugs.

**[8]** The evidence of Esquivel's possession of the cocaine is even more attenuated than the evidence in *Vasquez-Chan*. There was no doubt in *Vasquez-Chan* that the appellants knew that the cocaine was present in the house. In fact, one of the appellants had lived in the house for three months, and her name was on an electric bill sent to the house. Here, there is no evidence that Esquivel knew of the presence of the cocaine in the van or had the power to exercise dominion and control over the drugs. In contrast with the appellants in *Vasquez-Chan*, who undisputedly knew of the cocaine's presence, Esquivel was simply riding in the van. His "mere proximity to the drug, [his] presence on the property where it is located, and [his] association with the person who controls it are insufficient to support a conviction for possession." *Id.*

**[9]** The dearth of evidence regarding Esquivel's knowledge and possession of the cocaine leads us to conclude that Esquivel's possession conviction cannot be sustained. We turn now to the conspiracy conviction.

## II.  Conspiracy Conviction

**[10]** There is no question that there was a drug conspiracy. "Once a conspiracy is established, the government can prove a defendant's 'knowing participation' with evidence of the defendant's 'connection with the conspiracy.' " *United States v. Decoud*, 456 F.3d 996, 1014 (9th Cir. 2006) (quoting *Delgado*, 357 F.3d at 1066). "It is not a crime to be acquainted with criminals or to be physically present when they are committing crimes." *Herrera-Gonzalez*, 263 F.3d at 1095; *see also United States v. Estrada-Macias*, 218 F.3d 1064, 1066 (9th Cir. 2000) (quoting with approval a jury instruction requiring the government to prove that, "in addition to being present or knowing about the crime, the defendants knowingly associated themselves with the crime in some way as

participants — persons who wanted the crime to be committed — not as mere spectators"). Although the government needed to prove that Esquivel had only a "slight connection" to the conspiracy, "the term 'slight connection' in this context does not mean that the government's burden of proving a connection is slight." *Herrera-Gonzalez*, 263 F.3d at 1095.

In *Estrada-Macias*, there was extensive evidence of a drug conspiracy. The appellant admitted that he had been living in the trailer where methamphetamine was being manufactured for three months. Items used in the manufacturing were found in the trailer. He also was with two of the conspirators "within two hours after each had received a delivery of pills, in different places." *Estrada-Macias*, 218 F.3d at 1066. Although the evidence was "certainly sufficient to raise a strong inference that [he] must have known that several individuals living around him were engaged in a conspiracy to manufacture methamphetamine," the inference was "not enough to permit conviction." *Id.* We therefore reversed Estrada-Macias' conviction. *Id.* at 1068.

[11] The evidence here is weaker than the evidence in *Estrada-Macias* because there is no evidence linking Esquivel with any of the conspirators prior to the stop of the van. DEA Agent Bruce Fralick testified that the investigation of the drug conspiracy lasted for about a year and resulted in the arrests of 23 persons, and that it involved the interception of 14 telephones. He also testified, however, that Esquivel's name had never appeared throughout the extensive investigation. *Cf. Vasquez-Chan*, 978 F.2d at 548 (reversing conspiracy convictions where, during the course of the DEA's "massive, planned, and well-organized surveillance of a number of individuals who might be involved in large-scale cocaine trafficking operations," the two appellants had never been identified by the DEA as suspects, their names had never been mentioned by the conspirators, and they were not "ever referred to even obliquely"). Esquivel's name was not mentioned by the other conspirators, and he did not make any of the inter-

cepted phone calls.[4] There was no evidence that Esquivel ever used the cell phone, and the conversation with Sanchez, which concerned only directions to Sanchez's residence, does not reveal any knowledge of a drug conspiracy and would not indicate the presence of drugs to a passenger in the van.[5] None of the conspirators testified against him. There is simply no evidence tying him to the other conspirators, other than his presence in the van, and "[t]his court has held that '[m]ere casual association' with conspiring people is not enough to sustain a conviction.' " *United States v. Ramirez-Robles*, 386 F.3d 1234, 1241 (9th Cir. 2004) (second alteration in the original) (quoting *Estrada-Macias*, 218 F.3d at 1066), *cert.* denied, 544 U.S. 1035 (2005); *see also Herrera-Gonzalez*, 263 F.3d at 1097 ("[P]resence at the location of a conspiracy's activities, while the activities are taking place, knowing that they are taking place, without proof of intentional participation in the conspiracy, cannot support a conspiracy conviction.").

In *Herrera-Gonzalez*, the defendant "was apprehended at a ranch where methamphetamine was being manufactured." *Id.* at 1093. The defendant told a plausible story at trial that, if true, "made out a good case for acquittal," claiming that he knew nothing about the methamphetamine laboratory, had just met the co-conspirators, and had never been to the ranch prior to the day of the arrest. *Id.* at 1094. In stark contrast to the instant case, however, numerous witnesses in *Herrera-Gonzalez* gave testimony that contradicted the defendant's

---

[4]Christian Leiva, who provided translation services for the investigation, listened to the telephone call on Sanchez's phone between Sanchez and the vehicle, in which Sanchez gave the vehicle directions to his residence. Leiva testified that he recognized Sanchez's voice on the call, based on the other calls he had monitored during the course of the investigation, but that, after listening to a voice exemplar of Esquivel, he could not determine whether the other voice on the call was Esquivel's.

[5]Although Esquivel's wife was in possession of the phone when the van was stopped, Roberson testified that the driver was the one talking on the cell phone when the van stopped at the gas station to buy gas.

story and indicated, for example, that he was associated with the conspirators long before he claimed he was, that he had been at the ranch on prior occasions, and that he was aware that methamphetamine was being manufactured. This evidence of intentional participation in the conspiracy was sufficient to sustain his conspiracy conviction. *Id.* at 1098.

**[12]** Unlike *Herrera-Gonzalez*, the government has presented no evidence whatsoever that contradicts Esquivel's story or that indicates his "intentional participation" in the conspiracy. The government has emphasized that Esquivel must have known about the conspiracy, but it has failed to point to any evidence that supports the conviction. Our criminal justice system is not based solely on inferences and assumptions. There must be evidence sufficient to sustain a conviction, and, here, "[t]he record is barren of evidence" that Esquivel participated in the conspiracy. *Estrada-Macias*, 218 F.3d at 1066-67.

## CONCLUSION

**[13]** The government has presented no evidence that establishes Esquivel's knowledge or possession of the cocaine and no evidence of his participation in the conspiracy. Esquivel's convictions for possession with intent to distribute and for conspiracy to distribute drugs accordingly are

**REVERSED.**